IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JAMES "CHAD" YORK, individually, | § | |
| SANDY LYNN WINFREY YORK, | § | |
| individually, and LOREAL FULTZ, as | § | |
| Independent Administrator of, and on behalf | § | |
| of,  The ESTATE OF CHAZ LOGAN YORK | § | |
| and his heirs-in-law, | § | |
| | § | Civil Action No. _____ |
| Plaintiffs | § | |
| | § | |
| v. | § | |
| | § | |
| THE CITY OF BEAUMONT; and | § | |
| CHASE AARON WELCH | § | |
| | § | |
| Defendants | § | |

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

> **Beaumont Police Officer Chase Welch shot and killed Chaz York in the parking lot in front of Madison's Bar and Restaurant on Dowlen Road.  Chaz York and his friends went to Madison's Bar and Restaurant on Dowlen Road.  Once there, Chaz was assaulted by a criminal then killed by an off-duty officer.  Officer Welch, a trained expert marksman and skilled in martial arts, shot Chaz Welch five times, including shots to Mr. York's back, after Mr. York and his friends voluntarily left the restaurant.  Chaz York was not fleeing, had not been suspected of any serious crime, was not under arrest, did not possess a weapon, and did not pose a threat to Chase Welch.**

Table of Contents

I.      Introductory Allegations…………………………………………….…..3

        A.  Parties……………………………………………...…………..……..………3

        B.  Jurisdiction……………………………………………………………….…4

        C.  Venue………………………………………………………………..………5

II.     Factual Allegations …………………………………………………….…..…5

        A.  Introduction…...……………………………….…...…….…….……..………5

B.  Chaz Logan York…………………………………………………..………..5

C.  Officer Chase Welch………………………………………………….………6

D.  Chaz was assaulted by Levi Severson………………………………….……..7

E.  Chaz was leaving the scene when he was shot………………………….……..7

F.  Officer Welch needlessly shoots and kills Chaz York………………………..9

G.  Autopsy Report…………………………………………………………………11

H.  The City's Post-Death reporting……………………………………….....12

I.  The Cover-Up: Refusal to Produce Records…………………………………13

J.  Welch's Career at BPD was Littered with Warnings of Excessive Violence…...14

K.  Texas Commission on Law Enforcement Records……………………….……16

L.  Monell Liability: The City's longstanding policy, practice, and/or custom of using excessive force was a moving force behind and caused Chaz York's Death……………………………………………….…………17

    1.  The City's ratification of Welch's conduct reflects a policy and/or custom of excessive force……………………………………….……18

    2.  The City had actual or constructive knowledge of persistent, widespread use of excessive force that has become so common and well settled as to constitute a custom that fairly represents the municipal police……………………………………………....……..19

    3.  The City's lack of guidance or rules limiting the type of assistive-devices for off-duty officers other than firearms reflects a policy or custom to use deadly force as a first resort instead of less harmful Techniques………………………………………………….…………21

    4.  Defendant City's officers were part of a "code of silence" wherein other officers and supervisors habitually covered up use of excessive force by fabricating accounts to the media and in official reports and internal affairs investigations……………………………….………….........22

    5.  Defendant City's failure to train its police officers constitutes deliberate indifference to the rights and welfare of the citizens of Beaumont…………………………………………….……….………22

III.  Causes of Action…………………………………………….…….……….24

A.  Cause of Action Against Chase Aaron Welch under 42 U.S.C. § 1983 for Violation of 4th Amendment Rights…………………………………..……24

B.  Cause of Action Against City of Beaumont Under 42 U.S.C. §1983 for

Violation of 4ᵗʰ and 14ᵗʰ Amendment Rights…………..……………………28

IV.    Concluding Allegations……………………….………..……..…..……..……30

     A.  Conditions Precedent…………………………………………………..…30

     B.  Use of Documents…………………….…………..…..…..…….…..…30

     C.  Jury Demand…………………….………….…….…………………..…..31

     D.  Prayer…………………….……………….…….…………………………31

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW INTO COURT, COME PLAINTIFFS, James "Chad" York, Sandy Lynn Winfrey York, and Loreal Fultz, as representative of the Estate of Chaz Logan York (hereinafter collectively referred to as the "Plaintiffs") and for cause of action will show the following:

I.    Introductory Allegations

     A.    Parties

1.    Plaintiff James Chad York ("Mr. York" or "Chad York"), is a natural person who resides and did reside and was domiciled in Texas at all relevant times. Mr. York was Chaz York's legal and biological father. Chaz York is referred to herein as either "Chaz" or "Decedent." Mr. York asserts his individual claims.

2.    Plaintiff Sandy Lynn Winfrey York ("Mrs. York" or "Sandy York"), is a natural person who resides and did reside and was domiciled in Texas at all relevant times. Mrs. York was Chaz York's legal and biological mother. Chaz York is referred to herein as either "Chaz" or "Decedent." Mrs. York asserts her individual claims.

3.     Plaintiff Loreal Fultz, is a natural person who resides and did reside and was domiciled in Texas at all relevant times.  Fultz brings claims in this lawsuit as the Independent Administrator of the Estate of Chaz York.  Fultz asserts any and all claims available in the capacity as the Independent Administrator regarding Chaz's death, including all claims on behalf of the Estate

and all of Chaz' heirs-at-law including Chad and Sandy York.    Letters of Temporary Administration were issued to Loreal Fultz on or about October 8, 2018, in Cause Number P17790, in the County Court of Orange County, Texas, in a case styled *In the Estate of Chaz Logan York, Deceased.*

4.      Defendant, City of Beaumont, Texas ("Beaumont" or the "City"), is a Texas incorporated municipality/city.  Beaumont may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2)(B) and Texas Civil Practices and Remedies Code § 17.024 by serving Beaumont's mayor, clerk, secretary, or treasurer chief executive officer.  Beaumont's mayor, Becky Ames, may be served with process at City Hall, 801 Main Street, Beaumont, Texas 77701.

5.      Defendant, Chase Welch ("Officer Welch" or "Mr. Welch"), is a natural person who resides and is domiciled, and may be served with process, at 265 Alta Vista Dr., Livingston, TX 77351. Officer Welch may also be served with process at his place of employment, San Jacinto County Sheriff's Office, located at 75 W. Cedar Avenue, Coldspring, Texas 77331.

6.      Mr. Welch may also be served with process wherever he may be found, or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Welch at Mr. Welch's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Mr. Welch is being sued in his individual capacity and acted at all relevant times under the color of state law. Mr. Welch was employed by and/or was the agent and/or designee and/or contractor of and for Beaumont at all such times and acted or failed to act in the course of his duties for Beaumont.

        B.      Jurisdiction

7.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. §§ 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to

federal statutes providing for the protection of civil rights.  The suit arises under the United States Constitution and a federal statute – 42 U.S.C. § 1983. This court has personal jurisdiction over Defendants because they reside in Texas or are subdivisions of the State of Texas.

C.    Venue

8.    Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. §1391 (b)(1) and (2) because it is the division in the district in which a substantial part of the events or omissions giving rise to claims asserted in this pleading occurred.

II.    Factual Allegations

A.    Introduction

9.    The Plaintiffs provide in the factual allegation(s) sections below the general substance of certain factual allegations.  The Plaintiffs do not intend that those sections provide in detail, or necessarily chronological order, any or all allegations.  Rather, the Plaintiffs intend that those sections provide the Defendants with sufficient fair notice of the general nature and substance of the Plaintiffs' allegations, and further demonstrate that the Plaintiffs' claim(s) have facial plausibility.  Whenever the Plaintiffs plead factual allegations "upon information and belief," the Plaintiffs are pleading, in accordance with Federal Rule of Civil Procedure 11(b)(3), that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

B.    Chaz Logan York

10.    Chaz, as he is known by his friends, was born in Beaumont, Texas in 1993 to Chad and Sandy York.  Chaz owned a home in Vidor, Texas and worked as an estimator for Labelleco Fab LLC.  He enjoyed playing softball and was manager of his local club team.

C.    Officer Welch

11.    Officer Welch applied with the Beaumont Police Department on December 9, 2011. Prior to his employment with Beaumont Police Department (hereinafter "BPD"), Welch worked for four months for one security agency one month with another. With Patriot Security EOC, Welch left after one month because he "didn't agree with company policy. Lack of organization in management."

12.    Prior to his short tenure at two security companies, Welch served in the United States Marine Corp from 2008-2010 as an Infantry Rifleman. Welch lists experience with "close combat" and expertise with "M4/M16 Service Rifle, M249, . . . M9 Service Pistol…" Welch states he "also received training in close quarter combat techniques and military operations in urban terrain." Welch further lists these accomplishments:

(a) Awarded Expert Marksmanship Badge (USMC)

(b) Green Belt: Martial Arts (Marine Corps Martial Arts Program) and a Grey Belt in Martial Arts.

13.    In his application with BPD, Welch lists the following as equipment he can operate: "handguns, rifles, Squad Automatic Weapon (SAW), M 67 Fragmentation Grenade, Personal Computer."

14.    BPD offered employment to Welch on December 14, 2011.

15.    As is customary before hiring a peace officer, BPD conducted a background check on Mr. Welch. Upon information and belief, the City learned that Officer Welch had prior arrests involving violent behavior:

(a) In 2007, Welch was arrested or detained by the Chamber's County Sheriff's officer for fighting. No charges were ultimately filed.
(b) In 2008, Welch was arrested or detained by the Jefferson County Sheriff's officer as a "suspicious person." No offense resulted.

### D.    Chaz York was assaulted by Levi Severson

16.    On the night in question, Chaz and his friends were enjoying a night out together.  At Madison's on Dowlen, which is owned and operated by Madison's Restaurants, LP (hereinafter "Madison's"), Chaz was "sucker punched" by Levi Severson.  The assault occurred in the patio area of the bar.  Upon information and belief, the managers and employees of Madison's, as well as off-duty Officer Welch, witnessed the assault.  Upon information and belied, the City has a copy of a videotape of this assault.

17.    The assailant, Levi Severson, was charged with assault and arrested in Jefferson County. Mr. Severson has a long history of violence and has a rap sheet dating back to 2012 ranging from weapons violations, reckless driving, a couple DUIs, evading arrest, and drug possession.

### E.    Chaz was leaving the scene when he was shot

18.    Chaz was escorted out the back of the restaurant and Mr. Severson was allowed to leave out the front entrance.  Near the back patio area of Madison's, Chaz was confronted by his ex-girlfriend, Paulina Dickerson (hereinafter "Paulina").

19.    Chaz and Paulina were separated during the confrontation at the back of Madison's with the help of two Madison's employees, Charles McMorris and Trevor Milton, and Chaz' friend Marissa Berg (hereinafter "Marissa").  Marissa accompanied Chaz as he exited the rear of the bar. Two employees of Madison's followed Chaz and Marissa out the back of the bar – they were Charles McMorris and Trevor Milton.  One of the employees pushed Chaz.  Words were exchanged with threats including threats to Chaz.  Another person appeared at the back of the bar where the confrontation took place saying "Beaumont PD, Beaumont PD."  No other identification was given.

20.     Marissa and Chaz decided to leave the premises and walked away from the confrontation. Off-duty Officer Welch and the two employees of Madison's followed Chaz and Marissa around the building.  They traveled over four hundred (400) feet to get around the building and back to Chaz' car.  Marissa was driving the car and Chaz was ready to leave.



21.     During the walk around the building, the employees of Madison's and off-duty officer engaged in verbal confrontations and threats with Chaz.  The employees of Madison's and the off-duty officer said the following to Chaz:

    (a)     "You think you're such a badass hitting a woman."

    (b)     "Why don't you hit me?"

    (c)     "You're a pussy."

    (d)     "You're no kind of man, hitting a woman."

    (e)     "You put your hands on a woman, you piece of shit."

    (f)     "You think you are bad, why don't you put hands on me."

22.      Chaz responded to the verbal threats by turning around, walking backwards, and saying "you want to kick my ass, here I am."   In regard to the statements made in (1) – (6) above, one or more or all three persons, McMorris, Milton and Welch engaged in the threats and name-calling. This verbal barrage lasted the entire time it took to walk around the building and back to Chaz' vehicle – a distance of approximately four hundred feet or around 600-800 steps.

23.      At no time during this "walk around" did Officer Welch identify himself.  Nor did Welch arrest or detain Chaz York.  In addition, Welch did not order or instruct Chaz to do anything.  No one would have died if Welch would have let York leave.

24.      Chaz and Marissa made it all the way back to his car.  She was driving and sat in the driver's seat.  She put Chaz in the seat behind her and closed the door.  But Welch was not done with York.

### F.   Officer Welch Needlessly Shoots and Kills Chaz York

25.      Once inside the car, Welch continued to threaten and taunt Chaz.  Marissa also noticed Welch on the phone.  Welch then yelled at Chaz through the car windows to "get out you pussy." Welch used his hands to bang on the car while he was taunting Chaz.  While Marissa was ready to leave, she noticed Chaz outside the car. She exited the car, grabbed Chaz and tried to pull him back to the car. While Marissa was pulling Chaz back, Welch shot three times.  Marissa fell down and Chaz turned and ran towards Chic Fil A.  While Chaz was turned and running, more shots were fired.  Marissa got up, closed the trunk to the car, and drove towards Chaz.  When she saw Chaz fall, she parked the car and ran to Chaz.

26.      Marissa witnessed the event and never saw Chaz with a baseball bat or bat of any kind. Marissa provided this statement to the authorities.

27.    In response, Officer Welch fired eight-ten bullets from his .20 Glock 27 .40 caliber pistol in less than two seconds. Five of the eight bullets struck Chaz. One in each arm, one in his right thigh, one in his chest, and one in his back. The shots to his chest and back were fatal, piercing both lungs. The fatal shots were received after Chaz turned away from Officer Welch.  Upon information and belief, after firing his weapon eight to ten times, Welch dropped the weapon and ran away from the scene.  Some witnesses say he dropped the weapon, some say he just ran away.

28.    After Chaz was shot, he turned to run.  He was shot two more times in the back.  Marissa followed him and was with him when he died in the parking lot.  It was only after Marissa was questioned by officers at the police station that she was aware that Officer Welch was a police officer.  Chaz ran almost two hundred feet before collapsing.  The below image depicts his retreat path from the reckless, off-duty officer.



29.    Marissa provided the above facts to the detective for BPD but was never called to offer any testimony in the criminal matter.  Marissa never saw Chaz with a baseball bat.

30.    Chaz kept a bag of softball gear in the trunk of his car that was used by his softball team in the local softball league.  The gear included balls, gloves, and bats.  Officers for Beaumont Police Department located the gear upon searching Chaz' vehicle.

31.    Officer Welch, Chief Singletary, and the Beaumont Police department alleged that Chaz possessed a baseball bat and was charging Officer Welch at the time of the shooting.  Witnesses to the shooting deny that Chaz approached Officer Welch with a bat of any kind.  Several witnesses gave statements to that effect to the local authorities.  These witnesses were not presented to the grand jury.

32.    The City has provided no evidence of a baseball bat as part of the accident scene.  Upon information and belief, the only evidence the City has of a baseball bat was in the trunk of Chaz' car.  Upon information and belief, no baseball bat was found in his hands or near his body or anywhere on the ground along his path of retreat.  Upon information and belief, the bat identified by BPD was tested and revealed no DNA evidence or evidence of blood splatter that would be consistent with the shooting.

          G.      Autopsy Report

33.    Forensic Medical Management Services of Texas, P.A., conducted an autopsy of Chaz for Jefferson County.  The autopsy report, and the Medical Examiner's findings, indicate that Chaz did not die instantly upon being shot.  In fact, after being shot, Chaz ran approximately almost two hundred feet before falling to the ground.  Upon information and belief, Chaz was shot in the back as he turned to run away from the conflict with Officer Welch.  The autopsy report reveals the following injuries:

## PATHOLOGIC DIAGNOSES

1.  Multiple gunshot wounds: `
    a.  Gunshot wound of right shoulder with re-entry into the chest with a bullet track through the lungs, exiting the left axilla then re-entering the left upper arm and exiting the posterior left upper arm.
    b.  Gunshot wound #2 was located in the anterior left upper arm with the bullet going in an anterior to posterior direction exiting the left upper arm.
    c.  Gunshot wound #3 was located in the lateral right thigh and exited the posterior right thigh, through and through.
    d.  Gunshot wound #4 was located in the right back. The bullet traveled posterior to anterior through the lower lobe of the right lung and exited the right upper chest.
    e.  Gunshot wound #5 was located in the posterior right upper arm with the bullet going through the arm, severely fracturing the humerus, with the lead core exiting the anterior right arm. Two fragments of the bullet were recovered from this area.
2.  Hemothoraces.
3.  Abrasions of the face.
4.  Laceration of upper lip with chipped left upper central and lateral incisor teeth.
5.  Contusion of the posterior right hand.
6.  Acute ethanol intoxication.

34.     Dr. Brown gives the cause of death as "gunshot wounds (2) of chest and back, both through and through" and manner of death as "homicide." Upon information and belief, the fatal gunshots were fired while Chaz was retreating from the scene.

        H.      The City's Post-Death reporting

35.     Upon information and belief, Chief James Singletary of the Beaumont Police Department completed a custodial death report, as required by law, and it was transmitted to the Attorney General of Texas.

36.     Chief Singletary also gave an interview that was widely circulated in the media. In the KFDM interview, just two (2) days after the shooting, Chief Singletary stated the following:

        (1)     "It was his (Welch's) job to intervene to keep people from getting hurt out there."

        (2)     "Our Officer's don't carry Tasers off-duty."

37.     Even though Chaz, by no fault of his own, was criminally assaulted inside Madison's, Chief Singletary blamed Chaz as "part of the group creating the disturbance." Madison's manager on duty that night, Charles McMorris, did not believe that Chaz was being violent in any way, and

did not believe that Chaz did anything to warrant him being thrown out of the bar. But Chief Singletary said, "York had a bat and went toward the off-duty officer."  And continued: "If this officer wouldn't have done what he did someone … would have gotten killed out there."  Someone did.

38.    KFDM reported that it sought the 911 tapes and the videos from the restaurant and location, but the City rejected their request claiming the information was protected.  Plaintiffs received the same response.

39.    At the same time, representatives of the City misrepresented to the public the events of the incidents using disputed facts while refusing to release the information pertaining to the event. The City has represented that Chaz possessed a baseball bat and was charging at Officer Welch. Upon information and belief, there is no evidence that Chaz ever charged the officer.  Upon information and belief, there is no evidence of a baseball bat at the scene of the homicide other than in the trunk of Chaz' car.

40.    In other reports, the City has described the incident as a bar-room fight that spilled into the parking lot.  That just is not true.

I.    The Cover-Up: Refusal to Produce Records

41.    Upon information and belief, the City of Beaumont has chosen to engage in a cover-up regarding documents and other records regarding the shooting.  It failed to produce certain records. It then indicated to the Attorney General of Texas that the investigation regarding Chaz' death was ongoing, and thus that the City did not need to produce any responsive records pursuant to the Public Information Act.  The City continued in this position even after the grand jury decided not to indict Officer Welch for a criminal offense, which of course has no bearing on whether he violated Chaz' constitutional rights.  It also had no bearing on whether Officer Welch committed

a criminal offense when shooting and killing Chaz. Nevertheless, upon information and belief, the City has refused to produce all responsive documents and items because it knows that Chaz' killing by Officer Welch was unwarranted and without any legal or moral justification.

42.     The City was also in possession of evidence that Chaz York did not threaten Welch with a bat. Rather than seriously consider this evidence, the City accused the witnesses of lying and "tampering with evidence." Marissa Berg was accused of placing the bat back into the trunk of the car. Yet, Marissa's testimony to the BPD was that Chaz never took a bat from the car trunk, and that she never saw a bat that night.

<u>J.     Welch's Career at BPD was Littered with Warnings of Excessive Violence</u>

43.     Welch's time at BPD was marked with disciplinary issues, and the following is detail for which is known at this time. The following disciplinary items are public record as these were for conduct where discipline was "sustained:"

> (a) On August 1, 2013, Welch was officially disciplined for abusing or misusing department equipment when he damaged his laptop computer. Welch originally lied about the incident saying he was trying to "swat a mosquito" but later admitted he was upset and angry about getting into trouble on "a couple other things." Welch's discipline was sustained, and Welch was suspended 3 days without pay. The discipline was signed by James P. Singletary as Chief of Police.
>
> (b) On August 1, 2014, Welch was officially disciplined for improper use of force on a fleeing suspect. Welch used his police officer's vehicle to ram the fleeing suspect multiple times in contravention of the BPD policy on the matter and without authority from his superiors. Welch was disciplined with the following statement: "There was not sufficient justification for you to take matters into your own hands and intentionally strike another patrol car with your patrol car. The circumstances of this incident did not warrant lethal force." Welch was suspended for 10 working days and such discipline was signed by James P. Singletary as Chief of Police. Chief Singletary pointed out that Welch damaged a City vehicle and a light pole in the event. This discipline was the result of a formal complaint for inappropriate "use of force."
>
> (c) On March 26, 2015, Welch was suspended 1 day for causing a wreck and damaging a City vehicle.

44.    Only disciplinary items that are "sustained" by internal affairs are publicly available.  Upon information and belief, Officer Welch had multiple complaints filed against him for use of force where he received no discipline, including:

    (a) On August 12, 2012, Officer Welch held Joseph White at gunpoint while Mr. White was walking his dog near his home in the West End of Beaumont.  Officer Welch subjected Mr. White to a search of his person and threatened to shoot Mr. White's dog. Officer Welch had no probable cause to believe Mr. White had committed a crime or that he was about to commit a crime.  Upon information and belief, there is no discipline in Welch's file to reflect this event which means that the BPD felt Welch's conduct was "justified."

    (b) On March 5, 2016, Officer Welch shot and killed Herbert Edgar Ballance who was allegedly holding a gun to his own head.  Officer Welch shot him from long range through the mouth with a patrol rifle.  Upon information and belief, Officer Welch was cleared of any wrongdoing.

    (c) On, August 6, 2017, just four months after Officer Welch resigned from BPD and less than a year from the date he killed Chaz York, Officer Welch shot Vance Chasteen, a 48-year-old white male, in the right shoulder. This shooting event is currently under investigation by the Texas Rangers and the FBI.

45.    Notwithstanding the disciplinary issues and problems with excessive force against City property and persons, Welch was repeatedly promoted by the City.  The following table lists his salary increases with the approved department director:

| Date | Salary | Department Director | Reason |
|------|--------|---------------------|--------|
| 12/26/11 | 48,684.00 | James Singletary | New Employment |
| 10/1/12 | 49,170.99 | | Negotiation |
| 12/19/12 | 52,164.00 | Charles Jeffcoat | Civil Serv. – Step Increase |
| 10/7/13 | 53,207.23 | Charles Jeffcoat | Salary Increase |
| 1/30/14 | 54,900.00 | Charles Jeffcoat | Civil Serv. – Step Increase |
| 10/10/14 | 56,272.53 | James Singletary | Negotiation |
| 1/7/15 | 58,032.00 | Charles Jeffcoat | Civil Serv. – Step Increase |
| 10/14/15 | 59,192.64 | Charles Jeffcoat | Negotiation |
| 1/28/16 | 60,900.00 | Vernon "Jim" Cl. | Civil Serv. – Step Increase |
| 10/7/16 | 62,422.46 | Charles Jeffcoat | Negotiation |
| 1/13/17 | 64,284.00 | Charles Jeffcoat | Civil Serv. – Step Increase |
| **2/6/17** | **0.00** | **CHASE WELCH** | **RESIGNATION** |

46.    As illustrated in the table, the City continued to advance Welch's pay both as step increases and negotiations.  The City did this despite the disciplinary incidents and complaints listed above.

Welch's promotions from the City and advances in pay furthered an atmosphere for Welch that he could act with impunity toward the public-at-large with no consequences.

        K.     Texas Commission on Law Enforcement Records

47.     Upon information and belief, all of Officer Welch's training related to being a police officer has been reported to the Texas Commission on Law Enforcement (hereinafter "TCOLE"). According to TCOLE, Officer Welch became a licensed peace officer in 2011. Officer Welch had been a licensed peace officer only a little over 5 years at the time he shot and killed Chaz.

48.     Officer Welch, in addition to all of the experience gained through the USMC and law enforcement training, received significant training relating to the physical aspects of being a police officer. TCOLE records indicate that he received the following such training through BPD:

| Course Date | Course No. | Course Title | Course Hours | Institution | Certif. | Pass/Fail |
|---|---|---|---|---|---|---|
| 2/22/2016 | BPR | Basic Patrol Rifle Course | 24.00 | BPD | Y | Y |
| 2/18/16 | AED | AED Training | 1.00 | BPD | N | Y |
| 1/22/16 | LU3184 | Legislative Update 3184 | 4.00 | BPD | Y | Y |
| 12/10/2015 | Crash | Crash Reporting | 4.00 | BPD | Y | Y |
| 8/27/15 | BC | Bleeding Control | 2.00 | BPD | Y | Y |
| 1/20/14 | SUV TRG | NAPD for SUV Training | 16.00 | BPD | Y | Y |
| 1/11/14 | LU3183 | Legislative Update 3183 | 4.00 | BPD | Y | Y |
| 6/26/13 | PC | Professional Communications | 10.00 | BPD | Y | Y |
| 6/25/13 | ED | Excited Delirium | 4.00 | BPD | Y | Y |
| 6/25/13 | Taser Recert. | Taser Recert. Course | 6.00 | BPD | Y | Y |
| 6/24/13 | PCE | Plain Clothes Encounters | 5.00 | BPD | Y | Y |
| 6/24/12 | UOFR | Use of Force Reporting | 5.00 | BPD | Y | Y |
| 1/26/12 | HOB | Hobble Restraint | 2.00 | BPD | Y | Y |
| 1/26/12 | STST | Stop Stick | 2.00 | BPD | Y | Y |

| 1/23/12 | OS | Officer Safety Surviving the Traffic Stop | 8.00 | BPD | Y | Y |
|---------|-----|-------------------------------------------|------|-----|---|---|
| 1/19/12 | SRC | Startle Response Course | 8.00 | BPD | Y | Y |
| 1/16/12 | AS | Active Shooter | 24.00 | BPD | Y | Y |
| 1/12/12 | TASER | Taser Cert. | 8.00 | BPD | Y | Y |
| 1/11/12 | DWIOL | DWI Online Training | 4.00 | BPD | Y | Y |
| 1/10/12 | HP | Hurricane Prep. | 2.00 | BPD | Y | Y |
| 1/10/12 | OCIF | OCC Exposure to BB Path/Infec. Dis. | 2.00 | BPD | Y | Y |
| 1/6/12 | MVT | Mobile Video Training | 4.00 | BPD | Y | Y |
| 1/6/12 | OCSP | OC Spray | 4.00 | BPD | Y | Y |

49.     Officer Welch also completed the following training through other providers:

| Course Date | Course No. | Course Title | Course Hours | Institution |
|-------------|-----------|--------------|--------------|-------------|
| 3/6/17 | 4068 | Child Safety Check Alert List | 1 | OSS Academy |
| 8/16/16 | 2107 | Use of Force (Intermediate) | 13 | OSS Academy |

50.     With the training he received from the various law enforcement agencies, including the

USMC, Welch was skilled at delivering deadly force just like he did to Chaz York.

> L.     *Monell* Liability: The City's Longstanding Policy, Practice, and/or Custom of Using Excessive Force was a Moving Force Behind and Caused Chaz' Death

51.     The City of Beaumont is liable for all damages referenced in these pleadings, including

those suffered by Mr. and Mrs. York, the Estate of Chaz York, and Chaz' heirs'-at-law, pursuant

to *Monell v. Department of Soc. Servs.,* 436 U.S. 658 (1978) and its progeny.  Such liability arises

due to the action and/or inaction of the chief policymaker for the City of Beaumont and/or

Beaumont Police Department regarding material issues in this case.  The chief policymaker was

the chief of police at all relevant times, or the chief policymaker for the City had delegated such

chief policymaking authority, regarding police activities, to the chief of police.  The City's action

and inaction otherwise referenced in this pleading, related to alleged damages, and its policies, practices, and/or customs, were moving forces behind, resulted in, were producing causes of, and were proximate causes of the referenced constitutional violations and damages.

52.     Upon information and belief, the City's longstanding policy, practice, and/or custom of using excessive force was a moving force behind and caused Chaz' death.  The City of Beaumont has been sued a number of times for alleged excessive force claims.  Upon information and belief, a number of the material allegations made in those lawsuits will be shown to be true.  Further, Office Welch's conduct and the City of Beaumont's treatment of Officer Welch following Chaz' death (and cover-up of his conduct) is also evidence of such a policy, practice, and/or custom of the City of Beaumont encouraging, condoning, and allowing the use of excessive force by its police officers.

> 1.     The City's Ratification of Welch's Conduct Reflects a Policy and/or Custom of Excessive Force

53.     Upon information and belief, the City of Beaumont failed to discipline Officer Welch as a result of the unconstitutional seizure and use of force.  Upon information and belief, Officer Welch was not given any time off without pay, was not disciplined, was not reprimanded, was not instructed to act in any different manner in the future and was not instructed to participate in any additional training and/or education.  The City had plenty of evidence – more than sufficient to be presented to a grand jury – regarding Officer Welch's actions.  Even so, after review of all such evidence, contrary to any reasonable analysis, upon information and belief, the City chose to do nothing to Officer Welch.  Instead, upon information and belief, the Chief of Police and/or BPD assisted Officer Welch in securing a new position with the San Jacinto Sherriff's Department where, within a short period of time, he shot Vance Chastean in the right shoulder.

54.    The City's failure to discipline Welch for his homicidal conduct in this matter comes on the heels of his homicidal conduct in another matter just six months prior.  In that matter, the City failed to discipline Welch too.  Welch was also the subject of a suit against the City for excessive force for his conduct in holding man walking his dog on Dowlen Road at gunpoint and, on information and belief, threatening to kill the dog.  Welch was also the subject of a lawsuit for reckless use of a motor vehicle.

55.    The City's failure to discipline Welch in this matter then is no surprise.  Rather, it is an invitation to Welch and other officers for the City to engage in like conduct.  It is a statement by the City that its peace officers can use excessive force without regard to the rights of the citizens and without fear of retribution in any form, whether in discipline or discharge.  The City was also aware that its employees' accounts of the events in question were misleading or false.  The City was in possession of information of eye witnesses statements and/or testimony directly at odds with the evidence presented to the grand jury and which was promoted to the media.

    2.    The City had actual or constructive knowledge of persistent, widespread use of excessive force that has become so common and well settled as to constitute a custom that fairly represents the municipal police.

56.    The City has long known that the use of excessive force is widespread and persistent.  At the time of the event in question, the City possessed evidence of similar incidents in which citizens were injured and endangered by intentional or negligent police misconduct and/or serious incompetence. The City possessed actual or constructive knowledge of such similar incidents. From March 22, 2008 through March 22, 2018, the City shows the following Citizen Complaints:

```
Citizen Complaint incidents received between Mar 22, 2008 - Mar 22, 2018
By Allegation

[No data entered]:                                  1        0.89%
Department Policy:                                 11        9.82%
Department Policy / Fail to Use Video:              1        0.89%
Fail to Take Action:                               11        9.82%
Misconduct:                                         3        2.68%
Off-Duty Conduct:                                   2        1.79%
Officer Procedure:                                  7        6.25%
Officer Procedure (Reporting Use of Force):         1        0.89%
Profiling:                                          2        1.79%
Property Damage:                                    2        1.79%
Rude Conduct:                                       5        4.46%
Unauthorized Use of Force:                         26       23.21%
Unlawful Arrest:                                    5        4.46%
Unprofessional Conduct:                            31       27.68%
Unreasonable Use of Force:                          4        3.57%
```

57.    The above information was received from a FOIA request.  As detailed, it demonstrates several categories of data applicable to the case at hand.  For the time period noted, there are several noted complaint areas pertaining to use of force and off-duty conduct.  Of those complaints, the following table illustrates the outcome:

```
Citizen Complaint incidents received between Mar 22, 2008 - Mar 22, 2018
By Finding

[No data entered]:                                  9        8.04%
Documented:                                         2        1.79%
Exonerated:                                        44       39.29%
Not Sustained:                                     10        8.93%
Sustained:                                         21       18.75%
Unfounded:                                         20       17.86%
Withdrawn:                                          6        5.36%
```

58.    As is evident, most of the complaints go unheeded.  Much like the whitewashing of excessive force pertaining to Officer Welch, it appears that the City's treatment of allegations of excessive force is systemic in its lack of concern or discipline pertaining to the matters.  And, while the above are pertaining to Citizen Complaints, the following information is pertaining to Administrative Complaint incidents:

```
Administrative Complaint incidents received between Mar 22, 2008 - Mar 22, 2018
By Allegation

Department Policy:                                      105        45.85%
Department Policy - (Untruthfulness):                     1         0.44%
Department Policy -Tardiness:                             1         0.44%
Fail to Qualify:                                          5         2.18%
Fail to Take Action:                                     12         5.24%
Firearms Discharge:                                       2         0.87%
Misconduct:                                              18         7.86%
Missing Property/Money:                                   3         1.31%
Off-Duty Conduct:                                         8         3.49%
Officer Procedure:                                       20         8.73%
Other:                                                    5         2.18%
Performance Standard:                                     7         3.06%
Police Vehicle Accident:                                  2         0.87%
Property Damage:                                          1         0.44%
Rude Conduct:                                             1         0.44%
Unauthorized Use of Force:                                2         0.87%
Unlawful Arrest:                                          1         0.44%
Unprofessional Conduct:                                  17         7.42%
Use of Force:                                            18         7.86%
```

59.    Of the Administrative Complaints, a substantial portion of the complaints deal with the use of force and off-duty conduct.  Plaintiffs expect discovery to clarify the limited information received.   As reflected in these complaints, the majority or substantial portion of the complaints are for use of force and officer misconduct.  However, the percentage of complaints that result in any discipline or further action is limited and a small portion of the data received.  This further exhibits a tolerance by the City of officer misconduct regarding the use of force which leads its officers to believe they can act with impunity, whether on- or off-duty.

> 3.    The City's lack of guidance or rules limiting the type of assistive-devices for off-duty officers other than firearms reflects a policy or custom that to use deadly force as a first resort instead of less harmful techniques.

60.    The City does not authorize police officers to carry Taser devises while off-duty, unless a police officer is engaged in police-related outside employment.  Upon information and belief, the City also does not authorize police officers to carry any of the other "control devices" when off-duty and not engaged in police-related outside employment.  However, the City authorizes police officers to carry firearms while off-duty.  Thus, upon information and belief, the only use of force assistive-device which the City allows its policy officers to carry when off-duty, and not engaged

in police-related employment, is a firearm.  This understanding is bolstered by admission and statements of Chief Singletary in his October 18, 2016 interview with KFDM.

https://kfdm.com/news/local/police-chief-supports-officer-after-shooting.

61.    Therefore, even though Officer Welch did not need to use any assaultive-type force with Chaz, when deciding to do so regardless, the only assistive device allowed but the City, upon information and belief, for Officer Welch to carry off-duty, and use, was a firearm.  This led to an escalation of the conflict in a situation where no one should have died.

       4.    **Defendant City's Officers were part of a "Code of Silence" wherein other officers and supervisors habitually covered up use of excessive force by fabricating accounts to the media and in official reports and internal affairs investigations.**

62.    By allowing a policy "code of silence" to cover up officers' use of excessive force, especially Officer Welch, by fabricating accounts to the media and in official reports and internal affairs investigations, the City as exhibited a custom or policy of covering up constitutional violations.  As part of this official policy or custom, Officer Welch used excessive deadly force with the knowledge that no disciplinary action would be taken against him by the Police Department.

       5.    **Defendant City's failure to train its police officers constitutes deliberate indifference to the rights and welfare of the citizens of Beaumont.**

63.    Notwithstanding the amount of complaints against the City for excessive force, and ignoring Welch's prior conduct, the City turned a blind-eye to a violent, reckless employee.  And, while the City did not discipline Welch for harming a person, which he did multiple times leading to Chaz' death, the City did discipline Welch for a pattern of aggressive and violent behavior toward its property.  What the City has shown in its supervision and treatment of Welch is a disregard of the right of its citizens and over-concern with the protection of its computers and vehicles.  The City was aware specifically of a pattern of conduct on the part of Officer Welch of

constitutional violations from conduct evidencing lack of judgment, lack of common sense, lack of safe practices, yet failed to properly train or supervise him. Officer Welch's prior conduct reflected "an even greater magnitude of obviousness of the need for training and predictability of the consequences without training" due "to behavior and tendencies he had previously exhibited." *See Hobart v. City of Stafford,* 784 F.Supp.2d 732, 754 (S.D.T.X. April 29, 2011) *citing Brown v. Bryan County*, 219 F.3d 450, 463 (5th Cir. 2000) (after U.S. Supreme Court rejected hiring claim, the 5th Circuit allowed the failure to train claim proceed to the jury).

64.     Defendant City's failure to train constitutes a §1983 action because the City had (1) inadequate training procedures; (2) inadequate training of Welch caused him to use excessive force, and (3) the City's policymakers were deliberately indifferent to Welch's excessive use of force. As is evidenced at the training depicted above (in paragraphs 47 - 49). Welch was inadequately trained in the use of deadly force whether on- or off-duty. Welch was inadequately trained in handcuff policies, offender's rights, detainee relations, or Fourth Amendment protections. BPD failed to provide Welch training for:

> (a)     Proper use of non-lethal weapons, such as batons or chemical spray;
>
> (b)     Appropriate and adequate information for first response off-duty officers;
>
> (c)     Proper use of firearm;
>
> (d)     Proper use of non-lethal, self-defense measures;
>
> (e)     Proper use of crisis intervention techniques; and
>
> (f)     Limiting excessive use of force and use of deadly force.

Defendant City's violations outlined *supra* were the moving force behind the constitutional violation. "Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocence third parties will meet with the approval

of city policymakers, the affirmative link/moving force requirement is satisfied." *Grandstaff v. City of Borger,* 767 F.2d 161, 170 (5th Cir. 1985).

III.     Causes of Action

   A.     Cause of Action Against Chase Welch Under 42 U.S.C. § 1983 for Violation of 4th and 14th Amendment Rights

65.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant Welch is liable to the Plaintiffs and Chaz' heirs at law, pursuant to 42 U.S.C. § 1983, for violating Chaz' rights guaranteed by the Fourth Amendment alone, and/or in addition and/or, in the alternative, as the Fourth Amendment has been incorporated to be applied to the States pursuant to the Fourteenth Amendment. Officer Welch acted and failed to act under color of state law at all times referenced in this pleading. Officer Welch was deliberately indifferent to Chaz' constitutional rights, and he acted in an objectively unreasonable manner when seizing and using force with Chaz. He exercised constitutionally impermissible excessive force and seizure. Officer Welch violated clearly established constitutional rights, and his conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident.

66.     It was clearly-established law, in the Fifth Circuit, at the time Officer Welch chose to assault and shoot and kill Chaz, that an officer cannot physically assault with his hands, or shoot with a firearm, a person who is not resisting arrest, is not fleeing, is not suspected of a serious crime, and who is not a risk of serious injury to the officers or others. Further, it was at the time clearly-established law in the Fifth Circuit that a law enforcement officer's use of force is excessive when an officer strikes, punches, or violently slams a suspect who is not resisting arrest. Use of a

firearm is force well beyond striking or punching a person not resisting arrest and would thus be unconstitutional excessive force and seizure.

67.    It should be undisputed that there is absolutely no factor or fact which cuts in favor of Officer Welch's chosen use of force in this case.  His use of force was objectively unreasonable, unconstitutional, and against clearly-established law.  There were also no exigent circumstances allowing Officer Welch to use the force which he chose to use.  Therefore, Officer Welch is not entitled to qualified immunities outlined in the facts above and recited here.

68.    At the time of the incident, Officer Welch had no reason to believe that Chaz was dangerous because:

(a)    Chaz York made no violent movements towards Officer Welch. Even if he did, there is no plausible justification under these facts to justify firing eight to ten bullets at Chaz. Incidentally,  those bullets were fired in the direction of Dowlen Road. This, of course, shows Officer Welch's level of recklessness and disregard for the health and safety of others in the area.

(b)    Welch followed Chaz and Marissa for over four hundred feet, walking, giving Welch and Chaz ample time to cool down. During the 600-800 steps around the building, Welch continued to threaten to fight Chaz and escalated the conflict.

(c)    Chaz York did not have a gun and was 15 feet from any officer or any other person.

(d)    After the non-fatal shots, Chaz York turned his back to Officer Welch and retreated – Welch continued to shoot at Chaz and inflicted the fatal injuries while Chaz was running away.

(e)    Officer Welch was aware of the incidents leading to Chaz' expulsion from the restaurant and was aware that Chaz had been sucker-punched inside the restaurant.

(f)    Officer Welch was aware of Chaz' physical and mental condition before firing his weapon.

(g)    Officer Welch witnessed Chaz walking away from the scene but continued to escalate the conflict by threatening Chaz at a time when the situation had calmed down.

(h)    Officer Welch re-ignited the event by threatening Chaz while Chaz was in his car.

(i)    Officer Welch opened fire on Decedent despite the fact that Decedent was unarmed.

(j)    Officer Welch had extensive martial arts training at the time of the incident in question and could have chosen a less violent way to protect himself if he feared danger.

(k)    At the time Welch opened fire, Chaz was being pulled by another innocent citizen, Marissa Berg, back to his car.  Welch endangered Marissa with his reckless shooting.

(l)    Chaz York never attempted flight or escape from Office Welch.

(m)    Chaz York did not resist arrest nor did Officer Welch place York under arrest.

(n)    Chaz York had not committed a felony prior to the use of excessive deadly force.

(o)    Chaz York did not threaten members of the community at large.

(p)    Chaz York did not threaten Officer Welch.

(q)    After fatally wounding Chaz, Welch ran away from the scene.

69.    Therefore, by using subjectively and objectively unreasonable deadly force while acting under color of state law, Defendant Welch violated Decedent's rights under the Fourth Amendment of the United States Constitution and caused wrongful death.

70.    Defendant Welch's conduct which was objectively unreasonable, resulted from his lack of training, and comported with the City of Beaumont, Texas and Beaumont Police Department's improper and/or illegal policies and practices.

71.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1982.  Therefore, the heirs-at-law, including Mr. York, Sandy York, and Chaz' siblings, and the Estate of Chaz York, seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code §

71.021), the Texas Constitution, common law, and all related and/or supporting case law. Therefore, Chaz' estate and/or her heirs at law suffered the following damages, for which they seek recovery from this natural person Defendant:

    (a) Chaz York's conscious physical pain, suffering, and mental anguish;
    (b) Chaz York's medical expenses;
    (c) Chaz York's funeral expenses; and
    (d) Exemplary/punitive damages.

72.    All such damages were caused and/or proximately caused by the natural person Defendant. If Chaz had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

73.    Chad York and Sandy York also seek all damages available to them individually as a result of Chaz' wrongful death.  Chad York and Sandy York were Chaz' legal and biological parents. Like all other damages alleged in this section of this pleading, damages suffered by Mr. York and Sandy York were caused and/or proximately cause by the natural person Defendant.  Therefore, Mr. York and Sandy York seek and are entitled to obtain all remedies and damages available to him for the 42 U.S.C. § 1983 claims.   The natural person Defendant's actions caused, were proximate causes of, and/or were producing causes of the following damages suffered by Chad York and Sandy York, for which they individually seek compensation:

    (a) Loss of services that Mr. York and Sandy York would have received from their son, Chaz;
    (b) Chaz' funeral expenses;
    (c) Past mental anguish and emotional distress suffered by him resulting from and caused by the death of Chaz;
    (d) Future mental anguish and emotional distress suffered by him resulting from and caused by the death of Chaz;
    (e) Loss of companionship and society that they would have received from Chaz; and
    (f) Exemplary/punitive damages.

74.    Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Chaz' constitutional rights.  The natural person Defendant's actions and/or

inaction showed a reckless or callous disregard of, or indifference to, Chaz' rights and safety.  In addition, all such damages resulted from the natural person Defendant choosing to proceed with conscious indifference to and disregard of the rights, safety, or welfare of Chaz after having an actual subjective awareness of the risk involved but nevertheless proceeding with actions resulting in her injuries and death.  The natural person Defendant's actions, when viewed objectively from his standpoint at the time of the acts and/or omissions involved, resulted in an extreme degree of risk, considering the probability and magnitude of potential harm to Chaz.  Moreover, all Plaintiffs in this case seek from the natural person Defendant reasonable and necessary attorney's fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> B.    Cause of Action Against City of Beaumont Under 42 U.S.C. § 1983 for Violation of 4th and 14th Amendment Rights.

75.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all factual allegations above) to the extent they are not inconsistent with the cause of action pled here, Defendant City of Beaumont is liable to the Plaintiffs, and Chaz' heirs at law, including Chad York, Sandy York, and Chaz' heirs-at-law, pursuant to 42 U.S.C. § 1983, for violating Chaz' rights guaranteed by the Fourth Amendment alone, and/or in addition and/or in the alternative as the Fourth Amendment has been incorporated to apply to the States pursuant to the Fourteenth Amendment.  Officer Welch was at all times referenced in this pleading acting in the course and scope of his duties of and for the City of Beaumont, and he was acting under color of state law.  The City acted or failed to act under color of state law at all relevant times.

76.    Upon information and belief, the City's customs, practices, and/or policies caused, were proximate causes or, and/or were producing causes of all damages referenced herein.  The

Beaumont Chief of Police was the chief policymaker at all times relevant to this pleading, and he was the one that determined the customs, practices, and policies referenced herein, or the City's chief policymaker had delegated to the Beaumont Chief of Police such chief policymaking authority.  The chief policymaker's failure to adopt, upon information and belief, policies referenced in this pleading, as well as his failure to stop customs, practices, and policies which developed and which are mentioned in this pleading, were intentional choices.  Thus, the City was deliberately indifferent to, and acted in an objectively unreasonably manner regarding, Chaz's constitutional rights (as well as the rights of any others who suffered Fourth Amendment violations at the hands of Beaumont police officers.)  Upon information and belief, the City's customs, practices, and/or policies were moving forces behind the violation of Chaz's right and showed deliberate indifference to the known or obvious consequences of constitutional violations.  They also, upon information and belief, caused, were proximate causes or, and were producing causes of all damages resulting from unconstitutional excessive force against and seizure of Chaz.

77.    The United States Court of Appeals for the Fifth Circuit has held that using a state's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, the heirs-at-law, including Chad York and Sandy York, and the Estate of Chaz York, seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.),* the Texas survival stature (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  Therefore, Chaz York's estate and/or his heirs at law suffered the following damages, for which they seek recovery from the City:

    1) Chaz York's conscious physical pain, suffering, and mental anguish;
    2) Chaz York's medical expenses; and

3)  Chaz York's funeral expenses.

78.    All such damages were caused and/or proximately caused by the City.  If Chaz had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.

79.    Chad York and Sandy York also, individually, seek and are entitled to all remedies and damages available to them for the 42 U.S.C. § 1983 violations.  Chad York and Sandy York seek those damages due to the wrongful death of their biological and legal son.  All damages suffered by the heirs-at-law, including Chad York and Sandy York, were caused and/or proximately caused by the City, and the City's policies, practices, and/or customs were moving forces behind such damages.  Therefore, the City's actions, policies, practices, and customs caused, were proximate causes of, were producing causes of, and were moving forces behind the following damages suffered by Chad York and Sandy York, for which they individually seek compensation:

1)  Loss of services that Chad York and Sandy York would have received from their son, Chaz York;
2)  Chaz York's funeral expenses;
3)  Past mental anguish and emotional distress suffered by him/them resulting from and caused by the death of Chaz York;
4)  Future mental anguish and emotional distress suffered by him/them resulting from and caused by the death of Chaz York; and
5)  Loss of companionship and society that they would have received from Chaz York.

80.    Moreover, all Plaintiffs in this case seek from the City reasonable and necessary attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

IV.    Concluding Allegations

A.    Conditions Precedent

81.    All conditions precedent to assertion of Plaintiffs' claims have occurred.

B.    Use of Documents

82.     The Plaintiffs intend to use at one or more pretrial proceedings, in motion practice, and/or at trial all documents produced by the Defendants in this case in response to written discovery requests.

        C.      Jury Demand

83.     The Plaintiffs demand a jury trial on all issues which may be tried to a jury.

        D.      Prayer

84.     For these reasons, the Plaintiffs ask that the Defendants be cited to appear and answer, and that the Plaintiffs (and Chaz' heirs at law, including Chad and Sandy York) have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally applicable, for:

    1)      actual damages or and for Chad York and Sandy York individually including but not necessarily limited to the following:

        a)  Loss of services that Chad and Sandy York would have received from their son, Chaz York;
        b)  Chaz York's funeral expenses;
        c)  Past mental anguish and emotional distress suffered by him/they resulting from and caused by the death of Chaz York;
        d)  Future mental anguish and emotional distress suffered by him/they resulting from and caused by the death of Chaz York; and
        e)  Loss of companionship and society that he/they would have received from Chaz York;

    2)      actual damages of and for the Estate of Chaz York through its Independent Administrator Loreal Fultz (ultimately the heirs-at-law of Chaz, including Chad and Sandy York) including but not necessarily limited to the following:

        a)  Chaz York's conscious physical pain, suffering, and mental anguish;
        b)  Chaz York's medical expenses; and
        c)  Chaz York's funeral expenses;

    3)      exemplary/Punitive damages for all Plaintiffs (including all heirs at law of Chaz, including Chad and Sandy York) from the natural person Defendant;

4)      reasonable and necessary attorneys' fees for all Plaintiffs (including all heirs at law of Chaz York, including Chad and Sandy York) through trial and any appeal and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

5)      court costs and all other recoverable costs;

6)      prejudgment and post judgment interest at the highest allowable rates and

7)      all other relief, legal and equitable, general and special, to which the Plaintiffs (and all heirs at law) are entitled.

Respectfully submitted,

BRASHER LAW FIRM, PLLC

_____/s/ Clint Brasher_____
Clint Brasher
Attorney-in-charge
Texas State Bar No. 24009915
clint@brasherattorney.com
Joseph A. Muckleroy
Texas State Bar No. 24065801_
joe@brasherattorney.com
Nishi Kothari
Texas State Bar No. 24087862
nishi@brasherattorney.com
6430 Wellington Place
Beaumont, Texas 77706
Telephone:  (409) 832-3737
Telefax:  (409) 832-3838
*Attorneys for the Estate of Chaz York and heirs and Chad York*

AND

WELLER, GREEN, TOUPS, & TERRELL, LLP

_____/s/ B Terrell_____
B. Adam Terrell
Attorney-in-charge
Texas State Bar No. 1970900
Steven C. Toups
Texas Bar No. 20151606
sctoups@wgttlaw.com

P.O. Box 350
Beaumont, TX 77704-0350
Telephone: (409) 838-0101
Telefax: (409) 832-2940
baterrell@wgttlaw.com
*Attorneys for Sandy York*